UNITED STATES of America, Plaintiff–Appellee,

v.

Rodney Lee MORGAN, Defendant–Appellant.

No. 90–5031.

United States Court of Appeals, Tenth Circuit.

June 28, 1991.

Kathryn H. Phillips, Asst. U.S. Atty. (Tony M. Graham, U.S. Atty., Susan W. Pennington, Asst. U.S. Atty., with her on the brief), Tulsa, Okl., for plaintiff-appellee.

June E. Tyhurst, Asst. Federal Public Defender, Oklahoma City, Okl., for defendant-appellant.

Before SEYMOUR, MOORE, and BRORBY, Circuit Judges.

BRORBY, Circuit Judge.

Rodney Lee Morgan appeals his conviction by jury trial of the two-count indictment filed against him on September 6, 1989. The indictment charged Defendant with the following offenses: Count 1, armed bank robbery in violation of 18 U.S.C. § 2113(a) and (d), and aiding and abetting in violation of 18 U.S.C. § 2; and Count 2, possession of a firearm during the commission of a violent crime in violation of 18 U.S.C. § 924(c)(1).

On appeal Mr. Morgan raises the following issues: (1) "Was it error for the trial court to deny defendant's motion to suppress?"; (2) "Was it error for the trial court to allow admission of evidence of defendant's participation in a prior uncharged bank robbery?"; and (3) "Was it error for the trial court to increase defendant's Sentencing Guidelines offense level for obstruction of justice and for being a leader or organizer of the criminal activity?" Because we find each of the above queries properly answered in the negative, we affirm.

I.

On August 11, 1989, Tulsa Police Officer Michael Eubanks was notified by police dispatch that the Heartland Savings and Loan had been robbed by three black males. Prior to this date, Officer Eubanks had received information from his superiors in the police department notifying him that a Chevrolet El Camino, license plate number "OST 757," was suspected of being used in recent bank robberies that had occurred in the area. Officer Eubanks was aware that a vehicle matching that description was frequently driven by a resident in the area, Mr. Dwight Reed. Officer Eubanks was also aware Mr. Morgan was a possible suspect in the recent robberies in the area as Mr. Morgan had been previously tried and acquitted of a bank robbery involving a switch vehicle and a clothes switch by the robbers immediately following the robbery.

After receiving notification of the Heartland robbery from dispatch, Officer Eubanks called fellow police officer Jay Taylor, and the two officers positioned their cars at two separate locations near the residence of Mr. Reed. Soon after, Officer Eubanks noticed the suspect El Camino pass, carrying three black males, one of whom he knew on sight as Defendant, Rodney Morgan. Officer Eubanks then followed the car with his red lights on for several blocks until it pulled into Reed's driveway. Officer Eubanks pulled in behind the vehicle.

At this time, Mr. Morgan exited the vehicle on the passenger's side, carrying a large tan bag, and Mr. Reed exited on the driver's side.[1] Officer Eubanks then told the men to "hold up," and Mr. Morgan replied, "What do you want?" and began backing away. Officer Eubanks told Mr. Morgan not to run, but Mr. Morgan did so fleeing eastward around the north side of the residence. Officer Eubanks pursued Mr. Morgan to the back of the residence where he observed Mr. Morgan attempting to enter the Reed house through the back door. Unable to gain entry into the house, Mr. Morgan threw the tan bag he was carrying to the south side of the porch and headed back down the porch stairs in the direction of Officer Eubanks. Mr. Morgan then disregarded Officer Eubanks's order to get down on the ground and attempted to go by him. A struggle ensued, but Officer Eubanks ultimately subdued and handcuffed Mr. Morgan. Officer Taylor arrived to assist Officer Eubanks and handcuffed Mr. Reed near Mr. Morgan. The third male occupant of the vehicle, however, fled the scene and was not found.

After Mr. Morgan and Mr. Reed were secured, Officer Eubanks retrieved the tan bag, and it was taken along with the two men to the Tulsa Police Station where it was searched without a warrant. The bag contained, among other things, several pairs of blue jeans, several partial pairs of pantyhose, two pistols, and over $6,000 in cash, including bait money from Heartland bank.

Prior to his trial, Defendant brought a motion to suppress all evidence obtained as a result of the warrantless search of the tan bag. Defendant also argued his arrest was illegal as it was not supported by probable cause. The district court held an evidentiary hearing on Defendant's motion. Following the hearing, the district court denied Defendant's motion, finding there was probable cause for the warrantless arrest of Mr. Morgan, and that the warrantless search of the tan bag was lawful.

Mr. Morgan's case proceeded to trial. During the trial, a hearing was held outside the presence of the jury to determine whether the Government would be allowed to admit evidence relating to Defendant's involvement in a prior uncharged bank robbery. The court allowed the admission over the objection of Defendant. On December 5, 1989, the jury returned guilty verdicts as to both counts charged in the indictment. Defendant was subsequently sentenced to eighty-seven months on Count I, and sixty months on Count II, to run consecutively.

## II.

### A. Motion to Suppress

"In an appeal of the denial of a defendant's motion to suppress evidence, our standard of review is to accept the trial court's findings of fact, unless clearly erroneous, and to consider the evidence in the light most favorable to the Government." *United States v. McAlpine*, 919 F.2d 1461, 1463 (10th Cir.1990). "If or where findings are not made, this court must uphold the ruling if there is any reasonable view of the evidence to support it." *United States v. Neu*, 879 F.2d 805, 807 (10th Cir.1989) (*citing United States v. Comosona*, 848 F.2d 1110, 1111 (10th Cir.1988)). Ultimate determinations of reasonableness concerning Fourth Amendment issues and other questions of law, however, are reviewed de

---

1. A third passenger also exited the vehicle along with Mr. Morgan and Mr. Reed. He was later identified as Orlando Douglas.

novo. *United States v. Butler*, 904 F.2d 1482, 1484 (10th Cir.1990).

### 1. *Warrantless Arrest*

On appeal, Mr. Morgan contends the trial court erred in determining the warrantless arrest was supported by probable cause, arguing that he was "seized" at the time Officer Eubanks ordered him not to leave; that "it [is] at this time that Eubanks had to have probable cause to arrest"; and that probable cause did not then exist.

■ This court has previously identified three categories of police/citizen encounters:

> "The first is referred to as a police-citizen encounter and is characterized by the voluntary cooperation of a citizen in response to non-coercive questioning. This has been held to raise no constitutional issues because this type of contact is not a seizure within the meaning of the Fourth Amendment....
>
> "The second type of encounter is the *Terry*-type of stop. The standards here are set forth in *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Most courts characterize this as a 'brief, non-intrusive detention during a frisk for weapons or preliminary questioning * * *.' This is considered a seizure of the person within the meaning of the Fourth Amendment, but need not be supported by probable cause. In order to justify an investigatory stop, the officer need have only 'specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime.'
>
> "The final category is an arrest which is characterized by highly intrusive or lengthy search or detention. An arrest is justified only when there is probable cause to believe that a person has committed or is committing a crime."

*United States v. Santillanes*, 848 F.2d 1103, 1106 (10th Cir.1988) (quoting *United States v. Cooper*, 733 F.2d 1360, 1363 (10th Cir.), *cert. denied*, 467 U.S. 1255, 104 S.Ct. 3543, 82 L.Ed.2d 847 (1984) (citations omitted)).

With these guidelines in mind, we review the encounter at issue in this case. The record reveals Officer Eubanks followed the suspect vehicle, in which Defendant was a passenger, for several blocks with his red lights on. When the vehicle turned into the driveway of the Reed residence, Eubanks pulled into the driveway behind it. Upon Defendant's exit from the vehicle, Officer Eubanks testified that the following exchange occurred:

> [Officer Eubanks:] I told them to hold up, and Rodney [Morgan] says, "What do you want?" And I said, "Just hold it right there." Rodney started to back up. I said, "Rodney, don't run." And he ran around on the north side of the house to the east.

■ "[N]ot all [encounters] between policemen and citizens involve[ ] 'seizures' of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). For purposes of invoking Fourth Amendment protection, a person is deemed "seized ... 'only if ... a reasonable person would have believed that he was not free to leave.'" *Michigan v. Chesternut*, 486 U.S. 567, 573, 108 S.Ct. 1975, 1979, 100 L.Ed.2d 565 (1988) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (opinion of Stewart, J.)); *see also INS v. Delgado*, 466 U.S. 210, 215, 104 S.Ct. 1758, 1762, 80 L.Ed.2d 247 (1984). This so-called "*Mendenhall* test" was discussed by the Supreme Court in its recent case, *California v. Hodari D.*, —— U.S. ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690 (1991), where the court emphasized that the language "only if" employed by the test "states a necessary, but not a sufficient condition for seizure ... effected through a 'show of authority.'" The Court then held that assuming the police officer's actions constituted a show of authority seeking to enjoin the defendant to halt, "since [the defendant] did not comply with that injunction he was not seized until he was tackled." *Id.* at 1552.

Here, the intrusion on Mr. Morgan in regard to the initial attempted questioning by Officer Eubanks and the subsequent exchange between the two was minimal. However, since Officer Eubanks had followed the car in which Defendant was a passenger for several blocks with his red lights flashing; since Officer Eubanks exited from a marked police car, in uniform, and asked the Defendant to hold up; and since Defendant, at least momentarily, *yielded* to the Officer's apparent show of authority, we find Mr. Morgan was seized for purposes of the Fourth Amendment during the initial portion of the encounter. *Cf. Hodari D.*, 111 S.Ct. at 1550 ("[On] [t]he narrow question ... [of] whether, with respect to a show of authority ... a seizure occurs even though the subject *does not yield.* We hold that it does not." (Emphasis added.)) We further find, however, this initial seizure was brief, nonintrusive, and within the parameters of *Terry.* Therefore, probable cause was not required and we need not decide whether it then existed. *Terry*, 392 U.S. 1, 88 S.Ct. 1868.

We are left with the question, however, of whether the seizure was otherwise proper. In *Santillanes*, we discussed when a *Terry*-type stop will be deemed appropriate, stating:

"*Terry* permits police officers who suspect criminal activity to make limited intrusions on an individual's personal security based on less than probable cause. *In order to justify an investigative stop, an officer need have only a reasonable, articulable suspicion that the person has been, is or is about to be engaged in criminal activity.* In evaluating the reasonableness of an investigative stop, courts are to examine

'whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.'

"This assessment of reasonableness is essentially a balancing test [weighing]
...

'the nature and quality of the intrusion on the individual's Fourth Amendment interests against the importance of the governmental interests alleged to justify the intrusion....'"

*Santillanes*, 848 F.2d at 1107 (emphasis added) (quoting *United States v. Recalde*, 761 F.2d 1448, 1454 (10th Cir.1985) (citations omitted)).

In determining whether Officer Eubanks had the reasonable, articulable suspicion required to make a *Terry*-type investigative stop, we look to those facts known to the officer at the time. Several weeks prior to August 11, 1989, Officer Eubanks was notified by one of his superiors, Sergeant Bell, that Mr. Morgan was a suspect in the recent robberies that had occurred in the area, and that Mr. Morgan had been tried and acquitted of a bank robbery charge in 1987. He was also informed that the modus operandi of the bank robbers in the 1987 robbery was that the robbers changed clothes after the robbery and that a car switch was involved. Sergeant Bell later informed Officer Eubanks that the suspected robbers in the Bixby robbery (which had occurred several weeks prior) were seen leaving the bank in an El Camino, bearing license plate "OST 757." Officer Eubanks had previously stopped that vehicle on an unrelated matter and knew that a resident in the area, Mr. Reed, frequently drove the vehicle. On the day of the Heartland robbery, Officer Eubanks was informed via police dispatch that the suspects in the robbery were three black males. Shortly after hearing the report, Officer Eubanks saw the suspect vehicle with three black males inside, recognizing one of the passengers as Mr. Morgan. Officer Eubanks followed the car with his red lights on for several blocks before pulling in behind it in the Reed driveway. He then saw Mr. Reed and Mr. Morgan exit the vehicle with Mr. Morgan carrying a tan bag.

In *United States v. Sokolow*, 490 U.S. 1, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989), the Supreme Court held determinations of the existence of reasonable suspicion in the context of investigative stops are to be based upon "'the totality of the circumstances—the whole picture.'" *Id.* at 8, 109 S.Ct. at 1585 (quoting *United States v.*

*Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 694, 66 L.Ed.2d 621 (1981)). We conclude the facts in this case, along with the reasonable inferences drawn therefrom, sufficiently gave rise to a "reasonable, articulable suspicion that [Mr. Morgan] ha[d] been, is, or [wa]s about to be engaged in criminal activity." *Recalde,* 761 F.2d at 1454 (citing *Terry,* 392 U.S. at 20–22, 88 S.Ct. at 1879–80); *see also United States v. Henning,* 906 F.2d 1392, 1395 (10th Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 789, 112 L.Ed.2d 852 (1991). We therefore find the investigative stop by Officer Eubanks was "justified at its inception". *Terry,* 392 U.S. at 20, 88 S.Ct. at 1879.

█ Next, we consider whether the stop was reasonably related in scope to the circumstances justifying it. As previously discussed, the initial encounter between Officer Eubanks and Mr. Morgan was brief and nonintrusive. Officer Eubanks did not use his siren even when the vehicle did not stop immediately; there was no physical force by the officer when he approached the suspects initially; and there is no indication in the record the officer removed his gun before approaching the vehicle. We hold the scope of the initial stop and detention involved herein was reasonable when balanced with the law enforcement interests at stake. *See United States v. Place,* 462 U.S. 696, 703, 103 S.Ct. 2637, 2642, 77 L.Ed.2d 110 (1983).

Having found a valid investigative stop and detention occurred during the initial portion of the encounter between Officer Eubanks and Mr. Morgan, we now turn our attention to the latter portion of the encounter. As previously discussed, " 'an arrest ... is characterized by highly intrusive or lengthy search or detention.' " *Santillanes,* 848 F.2d at 1106. In the present case, after ignoring Officer Eubanks's directive not to run, Mr. Morgan fled toward the back of the residence. Officer Eubanks pursued Mr. Morgan and found him attempting to enter the residence through a back door. Mr. Morgan then threw the bag he was carrying to the south side of the back porch and headed back in the direction of Officer Eubanks. At this point, Mr. Morgan asked, "What do you want, Eubanks?" Officer Eubanks told Mr. Morgan to get down on the ground. This directive was also ignored, and Mr. Morgan attempted to pass by the officer. A struggle ensued, but shortly thereafter the officer successfully subdued Mr. Morgan and handcuffed him to a nearby chain link fence. With the assistance of Officer Taylor, the driver of the vehicle was also handcuffed, and both men were taken to the Tulsa Police Station.

Having found the seizure occurring during the initial phase of the encounter was justified as an investigative detention under *Terry,* we must next look to the portion of the encounter where Officer Eubanks engaged in a struggle with and subdued Mr. Morgan. We find that at this point the encounter exceeded the parameters of an investigative detention and constituted an arrest. Thus, we find the encounter in this case included, at different times, both an investigative detention and an arrest. *Santillanes,* 848 F.2d at 1106–07; *see also Terry,* 392 U.S. 1, 88 S.Ct. 1868. Having so decided, we must determine whether the officer, at the time of the arrest, possessed the requisite probable cause to make the arrest without a warrant.

█ Probable cause will be found to exist where facts and circumstances within the officer's own knowledge, which the officer has received through reasonably trustworthy information, sufficiently warrant a man of reasonable caution to believe an offense has been or is being committed by the person to be arrested. *Dunaway v. New York,* 442 U.S. 200, 208 n. 9, 99 S.Ct. 2248, 2254 n. 9, 60 L.Ed.2d 824 (1979); *United States v. Maher,* 919 F.2d 1482, 1485 (10th Cir.1990). Probable cause must be evaluated in light of circumstances as they would have appeared to a prudent, cautious, trained police officer. *Maher,* 919 F.2d at 1485 (citing *United States v. Lopez,* 777 F.2d 543, 552 (10th Cir.1985), and *United States v. McCormick,* 468 F.2d 68, 73 (10th Cir.1972), *cert. denied,* 410 U.S. 927, 93 S.Ct. 1361, 35 L.Ed.2d 588 (1973)). The determination of whether probable cause exists is primarily a factual

question. *United States v. Fox*, 902 F.2d 1508, 1513 (10th Cir.), *cert. denied*, —— U.S. ——, 111 S.Ct. 199, 112 L.Ed.2d 161 (1990). Therefore, "[u]nless, in construing all evidence in a light most favorable to the government, the trial court's finding of probable cause is clearly erroneous, it must not be disturbed." *United States v. Alonso*, 790 F.2d 1489, 1496 (10th Cir.1986) (citing *United States v. Rios*, 611 F.2d 1335, 1344 (10th Cir.1979)).

 Following an evidentiary hearing on Defendant's motion to suppress, the district court concluded there was probable cause for the warrantless arrest of Mr. Morgan. Probable cause determinations are properly made using a totality-of-the-circumstances analysis. *Illinois v. Gates*, 462 U.S. 213, 238, 103 S.Ct. 2317, 2332, 76 L.Ed.2d 527 (1983). Mr. Morgan contends he was arrested without probable cause arguing the information relied upon by Officer Eubanks was not shown to be reliable. We find this contention without merit. The facts underlying Officer Eubanks' initial suspicions were derived from information relayed to him by a supervising officer who received information from a citizen witness and through other reliable police channels. We find the information communicated to Officer Eubanks was reliable, and along with the officer's personal observations and knowledge, gave clear support to a finding of probable cause to arrest Mr. Morgan. *See Easton v. City of Boulder*, 776 F.2d 1441, 1449–50 (10th Cir.1985), *cert. denied*, 479 U.S. 816, 107 S.Ct. 71, 93 L.Ed.2d 28 (1986) (discussing the relaxed standard of scrutiny to be applied in cases involving citizen-witness informants, and the lessened standard regarding the competency of evidence upon which probable cause may be based); *Karr v. Smith*, 774 F.2d 1029, 1032 (10th Cir.1985) (applying the fellow-officer rule and imputing the knowledge of a superior officer to the arresting officers). *See generally Gates;* 2 W. LaFave, *Search and Seizure*, §§ 3.4–3.5 (1987 & 1991 Supp.). Having already held Officer Eubanks possessed the necessary reasonable suspicion to conduct the initial investigative stop and seizure, we now hold that the totality-of-the-circum-stances—the facts establishing the officer's reasonable suspicion combined with the furtive actions and flight of Mr. Morgan—sufficiently support a finding of probable cause to arrest. *See Kolender v. Lawson*, 461 U.S. 352, 366 n. 4, 103 S.Ct. 1855, 1863 n. 4, 75 L.Ed.2d 903 (1983) (Brennan, J., concurring) ("[S]ome reactions by individuals to a properly limited *Terry* encounter, ... such as flight, may often provide the necessary information, in addition to that which the officers already possess, to constitute probable cause"); *Sibron v. New York*, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904–05, 20 L.Ed.2d 917 (1968) ("[D]eliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea*, and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest."); *United States v. Bell*, 892 F.2d 959, 967 (10th Cir.1989) (after holding the officer had reasonable suspicion of criminal activity, finding the defendant's actions of dropping his bag and running supplied the additional grounds to provide probable cause for his warrantless arrest), *cert. denied*, —— U.S. ——, 110 S.Ct. 2618, 110 L.Ed.2d 639 (1990). Accordingly, we hold the warrantless arrest of Mr. Morgan was supported by probable cause, and therefore lawful.

### 2. *Warrantless Search of Bag*

Defendant's second claim of error regarding the trial court's denial of Defendant's motion to suppress involves the warrantless search of the tan bag. Defendant argues the warrantless search was illegal as it was "not incident to an arrest," nor was it properly "an inventory search" as the trial court found. The Government argues "[t]he district court correctly upheld the search of the nylon gym bag" on the grounds stated. The Government also argues, as it did before the trial court, that "Morgan abandoned the gym bag and his right to challenge the search" by throwing the bag prior to his arrest.

We first reiterate that in reviewing a trial court's denial of a motion to suppress, we must accept the trial court's findings of fact unless clearly erroneous, and must consider all evidence in a light most favorable to the Government. *McAlpine*, 919 F.2d at 1463; *Neu*, 879 F.2d at 807. And where findings are not made, this court must uphold the ruling of the trial court if there exists any reasonable view of the evidence to support it. *Neu*, 879 F.2d at 807.

Included in the trial court's factual findings were the following findings relating to the tan bag: (1) that Mr. Morgan "threw the bag to the south side of the porch;" and (2) that "[t]he bag carried, and then thrown by the Defendant, was taken to the Tulsa Police Station and there searched." Upon review of the record, and viewing all evidence in the light most favorable to the Government, we find these factual findings of the trial court were not clearly erroneous.

We also conclude Mr. Morgan abandoned the gym bag and any privacy interests he had in it. In *Abel v. United States*, 362 U.S. 217, 241, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 (1960), the Supreme Court held the warrantless seizure of abandoned property did not violate the Fourth Amendment. *See also United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.) ("[A] warrantless search or seizure of abandoned property is not unreasonable under the Fourth Amendment."), *cert. denied*, 464 U.S. 859, 104 S.Ct. 184, 78 L.Ed.2d 163 (1983). Although the trial court neglected to make findings on this issue, we find the record reveals an abandonment. Under *Neu*, 879 F.2d at 807, we must uphold the denial of the motion to suppress "if there is *any reasonable view of the evidence* to support it." *Id.* (emphasis added).

In *Jones*, this court acknowledged that "[w]hen individuals voluntarily abandon property, they forfeit any expectation of privacy in it that they might have had." 707 F.2d at 1172. Thus, determinations of abandonment are based on whether the individual has retained any reasonable expectation of privacy in the object. *Id.* The existence of such an expectation is a question of intent requiring us to examine words spoken, actions taken, and other objective facts involved. *Id.*

Here, we have the trial court's finding that Mr. Morgan "threw" the bag to the south side of the porch and then came back in the direction of Officer Eubanks. The record indicates Mr. Morgan then attempted to go by Officer Eubanks, disregarding the Officer's order to get down on the ground. No attempt was made by the Defendant to retrieve the bag nor did he request the officers or anyone else to retrieve it for him.[2] While an abandonment must be voluntary, "[t]he existence of police pursuit or investigation at the time of abandonment does not of itself render the abandonment involuntary." *Jones*, 707 F.2d at 1172. *See also Smith v. Ohio*, 494 U.S. 541, ——, 110 S.Ct. 1288, 1290, 108 L.Ed.2d 464 (1990) (finding "a citizen *who attempts to protect his private property from inspection*, after throwing it on a car to respond to a police officer's inquiry, clearly has not abandoned that property." (Emphasis added.)) In the instant case, no attempt was made to protect the bag or its contents from inspection, nor did we find any manifestations by Mr. Morgan, verbal or otherwise, to indicate he retained a reasonable privacy interest in the bag. The fact that Mr. Morgan was in the backyard of someone he knew or was acquainted with, at the time he threw the bag, is of little significance. The record reveals we do not have before us a case where the item was left to the care or responsibility of another, or where there is a delayed indication of an intent to retain

---

2. The cross-examination of Officer Eubanks included the following colloquy regarding the tan bag:

> Q. Did anyone say to you anything about that bag on August 11th while you were still at the arrest scene? Did Rodney [Morgan] say to you anything about the bag?
>
> A. [Officer Eubanks:] No.
>
> Q. How about Dwight Reed? Did he say anything about the bag?
>
> A. No.

an expectation of privacy in the item. *See United States v. Burnette*, 698 F.2d 1038, 1048 (9th Cir.), *cert. denied*, 461 U.S. 936, 103 S.Ct. 2106, 77 L.Ed.2d 312 (1983). Mr. Morgan discarded the bag while he was in the backyard of the Reed residence. Dwight Reed, who resided on the premises, was handcuffed and taken to the police station along with Mr. Morgan. There is no indication that Mr. Morgan requested the assistance of anyone to help recover or protect the bag, and the record discloses no one else was present who could have provided such assistance. Moreover, the record indicates that the backyard of the Reed residence abutted an open field and wooded area. Thus, the bag would have been plainly visible to those passing by the yard via those open areas. As we noted in *Jones*:

> When Jones discarded the satchel, he may have hoped that the police would not find it and that he could later retrieve it. However, his ability to recover the satchel depended entirely upon fate and the absence of inquisitive (and acquisitive) passers-by.

707 F.2d at 1172. We believe Mr. Morgan's ability to recover the bag, if left where it was thrown, was equally dependent upon fate. Indeed, the facts before us make the possibility of recovery of the bag even more attenuated since here, unlike *Jones*, no other person was present at the scene to provide protection of the bag or assist in its recovery. Therefore, we hold Mr. Morgan voluntarily abandoned the bag, forfeiting his claim to object to its warrantless search.[3]

We also find the actions of Officer Eubanks regarding the bag and its contents, which included preparation of an indiscriminate and documented inventory list, and acquisition of a property receipt for the items, to be strong evidence that the inventory was conducted pursuant to "standardized criteria" or an "established routine." *Florida v. Wells*, —— U.S. ——, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). However, in light of our holding that Mr. Morgan abandoned his right to object to the search of the bag, we will not decide whether the record sufficiently supports the trial court's conclusion that the search of the bag was a proper inventory search.

## B. Admission of 404(b) Evidence

■ Defendant contends the testimony of Dwight Reed relating to Defendant's alleged participation in an earlier bank robbery was improperly admitted as Rule 404(b) evidence.[4] In support of this contention, Mr. Morgan argues: (1) that the "evidence was not relevant to a proper purpose under rule 404(b);" (2) that "[t]he probative value of this evidence, if any, was substantially outweighed by the danger of unfair prejudice, confusion of issues and misleading the jury;" and (3) that "[t]he court's limiting instructions failed to limit the purpose of the evidence to a relevant purpose, confused and misled the jury, and prejudiced the defendant."

■ Determinations of whether to allow the admission of evidence lies within the sound discretion of the trial court and will not be disturbed absent a clear showing of an abuse of discretion. *United States v. Record*, 873 F.2d 1363, 1373 (10th Cir.1989); *United States v. Cuch*, 842 F.2d 1173, 1175 (10th Cir.1988).

---

3. We find our holding on this issue bolstered by the recent Supreme Court case *Hodari D.*, where the Court held that even "assuming [the] pursuit constituted a 'show of authority' enjoining Hodari to halt, Hodari did not comply with that injunction and therefore was not seized until he was tackled. Thus, the cocaine [which he was carrying when spotted by police but threw during the chase] *abandoned* while he was running was not the fruit of a seizure, and his motion to exclude evidence of it was properly denied." *Id.*, 111 S.Ct. at 1548 (emphasis added and citations omitted).

4. Fed.R.Evid. 404(b) provides:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Prior to admitting the 404(b) evidence, the court held a separate hearing, outside the presence of the jury, to determine whether the testimony should be admitted. The court heard from the Government's witness, Dwight Reed, who offered testimony including detailed accounts of Mr. Morgan's participation in an uncharged bank robbery that occurred several weeks before the Heartland robbery prior at the Brookside Bank in Bixby, Oklahoma. The two robberies involved many similarities: both times a stolen car was used to drive to the banks; both involved robbers who wore masks made out of sweat pants; weapons were used in both; and the maroon-colored El Camino, which Mr. Morgan was in just prior to his arrest, was seen in the Bixby area following the robbery. At the end of the hearing, Defendant objected to the admission of the testimony as improper under Rule 404(b). The court then noted:

> [its] inclination is to think that it would be proper 404(B), along with his denial, and then the proximity in time of just a couple of weeks, and the method and scheme employed seem to be quite similar with the stolen vehicle and the use of the masks. . . .
>
> . . . .
>
> . . . I am inclined with the denial because of the issue of identification and absence of mistake and similarity of the schemes and the planning that went into the matter, that it has 404(B) significance here, and that the prejudice might well be outweighed by the relevance. And I will give some further thought to that.

After considering the objection overnight, the court deemed the testimony to be appropriate 404(b) material and admissible on that basis, stating:

> [U]nder the *Record* case and the case out of the Supreme Court of the United States [*Huddleston*] mentioned therein, the Court thinks under the facts and circumstances here that the Bixby bank incident, as explained by [Mr. Reed] . . . would be appropriate 404(B) material and the Court thinks its probative value outweighs its prejudicial effect.

In *Record*, 873 F.2d at 1373–76, this court reevaluated the proper application of Rule 404(b) in light of the inclusive approach toward the admission of 404(b) evidence vindicated by the Supreme Court case, *Huddleston v. United States*, 485 U.S. 681, 108 S.Ct. 1496, 99 L.Ed.2d 771 (1988). We therefore review the district court's decision to admit the 404(b) evidence by applying to the facts of this case the guidelines set forth in *Huddleston* and *Record*.

*Huddleston* provides four requirements in allowing the admission of 404(b) evidence: (1) the evidence must be offered for a proper purpose; (2) the evidence must meet the relevancy requirement of Rule 402—as enforced through Rule 104(b); (3) the trial court must assess whether the probative value of the evidence is substantially outweighed by its potential for unfair prejudice; and (4) the trial court shall, upon request, instruct the jury that the similar acts evidence is to be considered only for the proper purpose for which it was admitted. *Huddleston*, 485 U.S. at 691–92, 108 S.Ct. at 1502.

In *Record*, this court reaffirmed that prior uncharged acts evidence used to demonstrate motive, intent, knowledge, or plan does have probative value, particularly when "the uncharged misconduct is close in time and similar in method to the charged scheme." *Record*, 873 F.2d at 1375 (citation omitted). In this case, the uncharged act evidence related to a recent bank robbery involving many similarities to the charged robbery. Thus, we find the proffered testimony sufficiently meets the first two requirements of *Huddleston*—its offering was for a proper and relevant purpose. The third requirement of *Huddleston* has also been satisfied. The trial court specifically found the "probative value [of the evidence] outweigh[ed] its prejudicial effect." We give broad discretion to the trial court in making this determination. *Record*, 873 F.2d at 1375 (citing *United States v. Esch*, 832 F.2d 531, 535 (10th Cir.1987), *certs. denied*, 485 U.S. 908, 108 S.Ct. 1084, 99 L.Ed.2d 242, 485 U.S. 991, 108 S.Ct. 1299, 99 L.Ed.2d 509 (1988)).

Moreover, we find the evidence was highly probative on the issues of identity, absence of mistake or accident, and similarity in the charged plan or scheme. We also find the testimony's prejudicial effect was properly limited by the court's instruction to the jury immediately following the testimony.[5] Thus, the court did not abuse its discretion on this point. The final *Huddleston* requirement was similarly satisfied as the court gave, in addition to the limiting instruction immediately following the testimony, a similar instruction in its final charge to the jury.

We note that Defendant correctly asserts that the proper purpose and relevancy of the offered testimony was not *precisely* articulated by either the Government or the trial court in that the focus could have been further narrowed. In *United States v. Kendall*, 766 F.2d 1426, 1436 (10th Cir. 1985), *cert. denied*, 474 U.S. 1081, 106 S.Ct. 848, 88 L.Ed.2d 889 (1986), the requirement was imposed on the profferor of 404(b) evidence to "articulate precisely the evidentiary hypothesis by which a fact of consequence may be inferred from the evidence of other acts." However, since *Huddleston*, we have held that any failure to adhere to the requirements of *Kendall* will be deemed harmless if " 'the purpose for admitting the other acts testimony is apparent from the record, and the district court's decision to admit was correct.' " *Record*, 873 F.2d at 1375 n. 7 (quoting *United States v. Orr*, 864 F.2d 1505, 1511 (10th Cir.1988)). As our review of the record convinces us the court's decision was correct and in compliance with the *Huddleston* requirements, we find any fail-

ure in adherence to *Kendall* harmless. *See Orr*, 864 F.2d at 1511.

Accordingly, we hold the admission of the testimony of Dwight Reed was proper and not an abuse of the trial court's discretion.

### C. Increase of Defendant's Offense Level

Defendant's final contention is that the trial court erred in increasing his offense level. Defendant challenges "the sufficiency of the evidence for sentencing purposes that the defendant was an organizer or leader of criminal activity and that the defendant obstructed justice when he testified at trial."

We review factual findings by the sentencing court under a "clearly erroneous" standard. 18 U.S.C. § 3742(e) (West Supp.1991). Such findings will not be reversed unless they are without factual support in the record, or unless after reviewing all the evidence, we are left with the definite and firm conviction that a mistake has been made. *United States v. Beaulieu*, 893 F.2d 1177, 1182 (10th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3302, 111 L.Ed.2d 811 (1990). Where a question involves a mixture of both law and fact, but turns primarily on consideration of legal principles, a de novo review is appropriate. *United States v. Roberts*, 898 F.2d 1465, 1468–69 (10th Cir.1990) (citations omitted).

In this case, since Defendant is challenging the sufficiency of evidence, a primarily factual question, the clearly erroneous standard applies. *See id.; United States v. Backas*, 901 F.2d 1528, 1529 (10th Cir.),

---

**5.** Included in the court's admonition to the jury was the following statement:

Now I want you to understand that I have ruled that the Government may offer this evidence involving this prior bank robbery of the Bixby bank, but only for the very limited purpose here that I state to you at this time.

Evidence of such a prior transaction or previous incident may be considered as relevant by the jury only insofar as it constitutes a similar act. Evidence that the Defendant may have committed an act similar to the acts alleged in this indictment may not be considered by the jury as any evidence whatsoever determining whether the Defendant in fact

committed the acts charged in the indictment. Obviously the acts charged in the indictment is a separate incident in and of itself. However, you as the jury may consider evidence of the similar act, that is, the prior Bixby bank matter, in determining the state of mind or the intent with which the Defendant, Mr. Morgan, did the acts that are charged here in the indictment.

If you first find that the acts charged in the indictment are established by proper evidence beyond a reasonable doubt, and where proof of the similar act is established by the evidence the jury may then, but is not obliged to, draw the inference....

*cert. denied,* —— U.S. ——, 111 S.Ct. 190, 112 L.Ed.2d 152 (1990).

### 1. *Organizer or Leader of the Criminal Activity*

■■ Sentencing courts may consider any reliable information, including hearsay, in sentencing a defendant. *United States v. Rutter,* 897 F.2d 1558, 1563 (10th Cir.) (citing *Beaulieu,* 893 F.2d at 1180–81), *cert. denied,* —— U.S. ——, 111 S.Ct. 88, 112 L.Ed.2d 60 (1990). This includes determination of a defendant's role in the criminal activity. *Id.* Prior to imposing sentence, the court increased Defendant's offense level pursuant to § 3B1.1(c) of the United States Sentencing Commission, *Guidelines Manual* ("U.S.S.G."). U.S.S.G. § 3B1.1(c) directs the sentencing court, "[i]f the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels." [6] In making the increase, the court stated it was a "very reasonable inference from th[e] evidence" that Mr. Morgan was "calling the shots and making the decisions and telling them how to go about it." The court also found Mr. Morgan had "recruited a bunch of juveniles, young juveniles" and was "merely using these minors as his minions and had influenced them to assist in carrying out the robbery."

In *Backas,* we held that a defendant may be deemed a "supervisor" for purposes of U.S.S.G. § 3B1.1(c) upon a showing that the defendant exercised any degree of direction or control over a subordinate in the criminal scheme. 901 F.2d at 1530. Our review of the record fully supports the trial court's determination that Mr. Morgan was deserving of the two level increase provided in U.S.S.G. § 3B1.1(c). The increase was justified and supported by sufficient evidence in the record, thus, we do not find the court was clearly erroneous in adjust-

ing Mr. Morgan's offense level on this basis.

### 2. *Obstruction of Justice*

■ Defendant also argues the court's two level increase for obstruction of justice pursuant to U.S.S.G. § 3C1.1 was error. U.S.S.G. § 3C1.1 provides: "[i]f the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense, increase the offense level by 2 levels."

"[T]he district court's application of the Sentencing Guidelines to the facts of a particular case is entitled to due deference and its factual findings will not be reversed unless clearly erroneous." *United States v. Urbanek,* 930 F.2d 1512, 1514 (10th Cir. 1991) (citing *United States v. Keys,* 899 F.2d 983, 988 (10th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 160, 112 L.Ed.2d 125 (1990)).

The trial court made the following findings regarding Defendant's obstruction of justice: "the Court thinks that the defendant engaged in significant conduct [by giving] ... his fabricated version of what took place and his lack of involvement;" the Defendant "maintained all the way along that he wasn't involved in this bank robbery;" and "the defendant was very much involved, and the fact that he said he wasn't is a fabrication and an untruth ... he lied about it."

■ As we have previously held, merely denying guilt or exercising one's constitutional right to testify is not a proper basis for an enhancement under § 3C1.1. *Keys,* 899 F.2d at 988. However, an enhancement is justified where a defendant goes further and testifies falsely. We find the record amply supports the trial court's finding that the Defendant testified untruthfully, and therefore the enhancement

---

**6.** Subsections (a) and (b) of U.S.S.G. § 3B1.1 provide:

 (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by 4 levels.

 (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels.

of his sentence pursuant to U.S.S.G. § 3C1.1 was proper. *United States v. Beaulieu*, 900 F.2d 1531, 1535–37 (10th Cir.), *cert. denied*, —— U.S. ——, 110 S.Ct. 3252, 111 L.Ed.2d 762 (1990).

Accordingly, we find the district court's findings regarding Defendant's role in the offense were supported in the record, and not clearly erroneous. Therefore, the court properly imposed sentence based on a total adjusted offense level of 23, and criminal history category of IV.

### III.

For the above reasons, we AFFIRM the decision of the district court.

SEYMOUR, Circuit Judge, dissenting.

Because I believe the warrantless search of Mr. Morgan's bag was in violation of the Fourth Amendment to the United States Constitution, I respectfully dissent.

"In the ordinary case, ... a search of private property must be both reasonable *and* pursuant to a properly issued search warrant." *Arkansas v. Sanders*, 442 U.S. 753, 758, 99 S.Ct. 2586, 2590, 61 L.Ed.2d 235 (1979) (emphasis added). Thus, "[t]he mere reasonableness of a search, assessed in the light of the surrounding circumstances, is not a substitute for the judicial warrant required under the Fourth Amendment." *Id.* As the Supreme Court noted in *Sanders:*

" 'The warrant requirement has been a valued part of our constitutional law for decades, and it has determined the result in scores and scores of cases in courts all over this country. It is not an inconvenience to be somehow "weighed" against the claims of police efficiency. It is, or should be, an important working part of our machinery of government, operating as a matter of course to check the "well-intentioned but mistakenly overzealous executive officers" who are a part of any system of law enforcement.' "

*Id.* This important principle was also recognized *United States v. Chadwick*, 433 U.S. 1, 9, 97 S.Ct. 2476, 2482, 53 L.Ed.2d 538 (1977):

"The judicial warrant has a significant role to play in that it provides the detached scrutiny of a neutral magistrate, which is a more reliable safeguard against improper searches than the hurried judgment of a law enforcement officer 'engaged in the often competitive enterprise of ferreting out crime.' "

Notwithstanding the warrant's integral role in safeguarding the constitutional rights of this country's citizens, the Supreme Court has created "a few 'jealously and carefully drawn' " exceptions to the requirement that a warrant be obtained prior to a search. *Sanders*, 442 U.S. at 759, 99 S.Ct. at 2590 (quoting *Jones v. United States*, 357 U.S. 493, 499, 78 S.Ct. 1253, 1257, 2 L.Ed.2d 1514 (1958)). These exceptions apply when "the societal costs of obtaining a warrant, such as danger to law officers or the risk of loss or destruction of evidence, outweigh the reasons for prior recourse to a neutral magistrate." *Id.* "But because each exception to the warrant requirement invariably impinges to some extent on the protective purpose of the Fourth Amendment," it is the Government's burden to show that the circumstances surrounding a warrantless search fit one of these narrowly tailored exceptions. *Id.*, 442 U.S. at 759–60, 99 S.Ct. at 2590–91.

In this case, the district court held that the warrantless search of Mr. Morgan's gym bag fits into two of these exceptions— as incident to his arrest, and as an inventory. The majority, however, upholds the warrantless search on the grounds that the bag was abandoned—an argument conclusorily asserted in the Government's pretrial pleadings,[1] that was not developed at trial, and upon which the district court made no findings of fact. A reading of well-established Fourth Amendment jurisprudence, however, establishes that the circum-

---

1. The Government's Response to Defendant's Pretrial Motions merely stated that when Mr. Morgan could not enter Mr. Reed's house, he abandoned the bag. It contained no discussion or analysis of Fourth Amendment jurisprudence with respect to abandonment or how the facts of this case fit within that exception.

stances surrounding the search were such that no exception to the warrant requirement was applicable. Thus, the failure to obtain a warrant rendered the search unconstitutional.

## I.

## ABANDONMENT

"When individuals voluntarily abandon property, they forfeit any expectation of privacy in it," and thus "a warrantless search or seizure of abandoned property is not unreasonable under the Fourth Amendment." *United States v. Jones*, 707 F.2d 1169, 1172 (10th Cir.1983). Whether an individual has retained a reasonable expectation of privacy in property searched is to be determined by objective standards. *Id.* "An expectation of privacy is a question of intent, which 'may be inferred from words spoken, acts done, and other objective facts.'" *Id.* (quoting *United States v. Kendall*, 655 F.2d 199, 202 (9th Cir.1981), *cert. denied*, 455 U.S. 941, 102 S.Ct. 1434, 71 L.Ed.2d 652 (1982)). Thus, the inquiry as to whether a defendant voluntarily abandoned property is particularly fact-based.

Because the Government did not argue the exception at the suppression hearing, however, the district court made no findings of fact nor conclusions regarding abandonment. It would follow that Mr. Morgan saw no need to offer evidence to rebut the assertion that he abandoned his bag. While it is true that specific findings of fact are not always necessary to our disposition of an issue on appeal, *see United States v. Neu*, 879 F.2d 805, 807 (10th Cir.1989), a fully-developed record with respect to that issue is. *See Seibert v. Univ. of Okla. Health Sciences Center*, 867 F.2d 591, 597 (10th Cir.1989) ("An appellate court may affirm the judgment of a district court on any grounds that find support in the record, *provided the litigants have had a fair opportunity to develop the record.*" (emphasis added)); *see also Beaulieu v. United States*, 930 F.2d 805, 807 n. 2 (10th Cir.1991) (where record insufficient to address claim, appellate court may either remand for further fact-finding or decline to consider it), *cert. denied*, —— U.S. ——,

110 S.Ct. 3252, 111 L.Ed.2d 762 (1990); *V–1 Oil Co. v. Wyoming Dept. of Env't. Quality*, 902 F.2d 1482, 1493 (10th Cir.1990) (Ebel, J., dissenting) ("We can affirm on a ground not raised below provided the record is sufficiently clear to permit us to do so and provided that both parties had an adequate opportunity to develop the record on the issue we choose to rely on."), *cert. denied*, —— U.S. ——, 111 S.Ct. 295, 112 L.Ed.2d 249 (1990). Very rarely will such a record be availableon a motion to suppress when the issue we decide is not expressly argued at the suppression hearing. Because I do not believe Mr. Morgan has had a full and fair opportunity to develop in the record his intent with regard to abandonment, I believe it is improper to uphold the search on this ground. *Cf. V–1 Oil*, 902 F.2d at 1493.

Even if I did consider it appropriate to address this issue, I would conclude, based on the record we do have, that Mr. Morgan did most definitely *not* abandon his gym bag. A review of the cases reveals that courts use as a barometer of intent to abandon property a defendant's chances of recovering that property at a later date at the place where it was left, *see, e.g., Jones*, 707 F.2d at 1172 (abandonment when ability to recover property depended upon fate); *United States v. Williams*, 569 F.2d 823, 826 (5th Cir.1978) (leaving trailer unlocked and unguarded in public parking lot "is transparently an abandonment of the tight grip of ownership and reliance solely on the feeble hope of reacquisition"), and the defendant's affirmative denial of ownership or interest in the property, *see, e.g., United States v. Burnette*, 698 F.2d 1038, 1048 n. 19 (9th Cir.1983); *United States v. Kendall*, 655 F.2d 199, 200–01 (9th Cir.1981); *United States v. Canady*, 615 F.2d 694, 696–97 (5th Cir.1980). We employed this analysis in *Jones*, finding it relevant to whether the defendant had abandoned his property that he had left it on the ground outside a public building where "his ability to recover [it] depended entirely upon fate and the absence of inquisitive (and acquisitive) passers-by," and that he verbally dis-

owned any knowledge of it. 707 F.2d at 1172.

In our case, Morgan threw the bag ten to fifteen feet away from him over the side of the porch onto the ground in his friend's backyard. He did not leave the bag in a public place, and thus this is not a situation where his chances of reacquisition rest on the mere hope that no one would steal it—as might be the case if Morgan had thrown it on public property or into the backyard of a stranger. Rather, he easily could have asked a member of the Reed household to pick up the bag and take it into the house after he had been taken to the station. I do not accept the proposition that I have abandoned, for search and seizure purposes, everything I leave in a friend's backyard.

The facts relevant to the abandonment inquiry in this case closely parallel those the Supreme Court found not to constitute abandonment in *Smith v. Ohio*, 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (1990) (per curiam). In *Smith*, the Court upheld a state court ruling that a defendant did not abandon the bag he threw onto the hood of his car in a YMCA parking lot when the police asked him to "come here a minute." *Id.* at 1290; *State v. Smith*, 45 Ohio St.3d 255, 544 N.E.2d 239, 240 (1989). The Court concluded that "a citizen who attempts to protect his private property from inspection, after throwing it on a car to respond to a police officer's inquiry, clearly has not abandoned that property." *Smith*, 110 S.Ct. at 1290; *accord United States v. Jackson*, 544 F.2d 407, 410 (9th Cir.1976) (no abandonment when defendant dropped suitcase in airport and walked three steps away when addressed by DEA agents). The majority's attempt to distinguish the present case based on its characterization of why the defendant threw the bag in *Smith* is disingenuous at best. Mr. Smith no doubt threw his bag full of drug paraphernalia for exactly the same reason Mr. Morgan threw his gym bag—to protect it from police inspection. As *Smith* makes clear, it simply is of no consequence to a Fourth Amendment analysis that Mr. Morgan threw the bag to avoid being caught with incriminating evidence.

I also do not believe caselaw supports the majority's implicaton that an assertion of ownership, verbal or otherwise, is necessary in order for an arrestee to retain a reasonable expectation of privacy in property the police saw the arrestee carrying. To the contrary, when finding abandonment, courts rely on the defendant's *denial* of interest in the property, *not* the fact that the defendant did not expressly affirm ownership. *See supra* at 1576.

Finally, the majority's reliance on the fact that the Reed residence bordered on an open field misses the point. When an article is left on the private property of a friend, a person maintains a reasonable expectation of privacy in it no matter if the yard is located in the plains of Oklahoma or the tenements of Harlem. When the article is left in a public place, on the other hand, it is legally fair game for all passersby. The majority's citation to *California v. Hodari D*, — U.S. —, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), to bolster its argument, instead supports the logic of my distinction because Mr. Hodari threw his cocaine on a public street, not on the private property of a friend. *Id.* at 1549.

Moreover, it is clear that the police *knew* Mr. Morgan was not leaving the bag in a location that would expose it to the general public. At the suppression hearing, Officer Eubanks testified at length as to his familiarity with both Mr. Morgan and Mr. Reed. Based on Officer Eubanks' testimony, the district court found that:

"2. Eubanks had been advised by Sgt. Don Bell of the Tulsa Police Department Robbery Detail that a white-over-red Chevrolet El Camino bearing license OST–757 was suspected of being used as an escape vehicle in bank robberies.

"*Eubanks knew the car was registered to the mother of Dwight Reed, 4143 N. Johnstown, but most often driven by Dwight Reed and his brother.*

"3. Eubanks knew that the Defendant Morgan had been tried and acquitted of a bank robbery in the recent past in the District Court of Tulsa County, and the state's evidence had included

that of a car switch and a change of clothes by the robbers after leaving the bank. Eubanks knew Rodney Morgan on sight.

"4. On August 11, 1989, Eubanks' police radio advised him that three black males had robbed the Heartland Savings and Loan on East 31st Street.

"5. The robbery occurred at approximately 11:10 a.m. Shortly before 12:00 Noon, *Eubanks saw the El Camino, with three black males inside, turn into the driveway of the Reed home at 4143 N. Johnstown.*"

District Ct. Op. at 2 (emphasis added). Pursuant to an analysis based on objective factors, I would conclude that Mr. Morgan maintained a reasonable expectation of privacy in his bag when he threw it ten to fifteen feet away from him by the side of his friend's back porch.

## II.

### SEARCH INCIDENT TO ARREST

The district court held that the warrantless search of Mr. Morgan's gym bag fits into the exception created for searches incident to an arrest as formulated in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).[2] I disagree. The exception delineated by the Supreme Court in *Chimel* provides that an arresting offi-

cer may search for and seize anything that could be used by the arrestee to injure the officer, as well as any evidence the arrestee could possibly destroy during the course of, or "incident to", the arrest. *Id.* at 762–63, 89 S.Ct. at 2039–40; *see Chadwick*, 433 U.S. at 14, 97 S.Ct. at 2485 (1977); *United States v. Bonitz*, 826 F.2d 954, 956 (10th Cir.1987); *Lavicky v. Burnett*, 758 F.2d 468, 474 (10th Cir.1985), *cert. denied*, 474 U.S. 1101, 106 S.Ct. 882, 88 L.Ed.2d 917 (1986). The Court defined the area appropriate for such warrantless searches as that within the arrestee's "immediate control;" that is, the officer may search "the area from within which [the arrestee] might gain possession of a weapon or destructible evidence." *Chimel*, 395 U.S. at 763, 89 S.Ct. at 2040; *see Lavicky*, 758 F.2d at 474; *United States v. Vasey*, 834 F.2d 782, 786 (9th Cir.1987).

The underlying justification for a search under a *Chimel* exception to the Fourth Amendment warrant requirement is based on "'the exigencies of the situation,'" *United States v. Belton*, 453 U.S. 454, 457, 101 S.Ct. 2860, 2862, 69 L.Ed.2d 768 (1981) (quoting *McDonald v. United States*, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153 (1948)), and thus assumes that the search will occur as the police are in the process of subduing and securing the arrestee:

> *Robinson* stands for the proposition that, after a proper custodial arrest has been made, it is unnecessary to obtain a warrant to search the arrestee's person and clothing because it is the arrest that constitutes the significant intrusion under the Fourth Amendment; the search of the person is incidental and does not require additional justification. *See Robinson*, 414 U.S. at 235, 94 S.Ct. at 476–77; *United States v. Calandrella*, 605 F.2d 236, 248 (6th Cir.1979). However,
>
> "unlike searches of the person, *United States v. Robinson*, 414 U.S. 218 [94 S.Ct. 467, 38 L.Ed.2d 427] (1973); *United States v. Edwards*, 415 U.S. 800 [94 S.Ct. 1234, 39 L.Ed.2d 771] (1974), searches of possessions within an arrestee's immediate control cannot be justified by any reduced expectations of privacy caused by the arrest."

*United States v. Chadwick*, 433 U.S. 1, 16 n. 10, 97 S.Ct. 2476, 2486 n. 10, 53 L.Ed.2d 538 (1977).

Thus, because the gym bag was not on Mr. Morgan's person, I find the principles of *Robinson* inapplicable.

---

**2.** The Government also incorporates in its argument on this point the district court's reliance on *United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), to justify the search as incident to the arrest based on the contention that "[i]t is basic law that a person under arrest may be fully searched." Findings of Fact and Conclusions of Law, rec., vol. I, tab 13, at 4. In *Robinson*, however, the Supreme Court distinguished between searches of the arrestee's person, *i.e., the arrestee's body and clothing,* and searches of articles within the arrestee's immediate control:

"It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment. This general exception has historically been formulated into two distinct propositions. The first is that a search may be made of the *person* of the arrestee by virtue of the lawful arrest. The second is that a search may be made of the area within the control of the arrestee."

414 U.S. at 224, 94 S.Ct. at 471 (emphasis in original).

"[t]he potential dangers lurking in all custodial arrests make warrantless searches of items within the 'immediate control' area reasonable without requiring the arresting officer to calculate the probability that weapons or destructible evidence may be involved.

"However, warrantless searches of luggage or other property seized at the time of an arrest cannot be justified as incident to that arrest either if the 'search is remote in time or place from the arrest,' or no exigency exists."

Chadwick, 433 U.S. at 14–15, 97 S.Ct. at 2485 (emphasis added) (citations omitted). The circumstances surrounding the search in this case exceed the limits of this "carefully drawn" exception because the search was *neither* incident to the arrest *nor* carried out in the area that was within Mr. Morgan's immediate control.[3] While it is true that the determination whether the search-incident-to-arrest exception is applicable sometimes involves line-drawing of a subtle nature, the safety and evidentiary concerns underlying this exception are not at all implicated in this case. Mr. Morgan's bag was never closer than ten to fifteen feet behind him during his arrest, it was not seized until he was handcuffed to a nearby fence, and it was not searched until several hours later at the police station. As the Supreme Court reasoned in *Chadwick,*

"Once law enforcement officers have reduced luggage or other personal property not immediately associated with the person of the arrestee to their exclusive control, and there is no longer any danger that the arrestee might gain access to the property to seize a weapon or destroy evidence, a search of that property is no longer an incident of the arrest."

433 U.S. at 15, 97 S.Ct. at 2485.

It is clear, then, that the "search was not conducted in order to disarm defendant or to protect the safety of the officers. Additionally, no serious claim [was] made that destruction of evidence was feared." *United States v. Bonitz,* 826 F.2d 954, 956 (10th Cir.1987).

The Government's reliance on *United States v. Edwards,* 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974), to save the search despite the lack of contemporaneousness with the arrest is misplaced. Like *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), discussed *supra* at note 2, *Edwards* involved a search of the arrestee's person, not the area within her or his immediate control, and, thus, a different Fourth Amendment analysis is applicable, *see Chadwick,* 433 U.S. at 16 n. 10, 97 S.Ct. at 2486 n. 10; *Calandrella,* 605 F.2d at 247–50; *United States v. Schleis,* 582 F.2d 1166, 1170–72 (8th Cir.) (en banc). Since *Edwards,* the Supreme Court has continued to require contemporaneousness when the article searched is not on the arrestee's person. *See Belton,* 453 U.S. at 460, 101 S.Ct. at 2864 (search of immediate control area may be made as a "contemporaneous incident" of the arrest); *Chadwick,* 433 U.S. at 15, 97 S.Ct. at 2485 (warrantless searches of area within arrestee's immediate control not justified as incident to arrest if conducted remote in time or place from arrest).

This circuit also has invalidated warrantless searches of articles argued to have been within the arrestee's immediate control when the search was not contemporaneous with the arrest. *See United States v. Butler,* 904 F.2d 1482, 1484 (10th Cir. 1990) ("[I]f the police conduct a search that is not contemporaneous to arrest, a warrant will be necessary."); *United States v. McKinnell,* 888 F.2d 669, 673 (10th Cir. 1989) (general rule that search incident to

---

**3.** There is nothing in the district court's "Findings of Facts" to negate this conclusion. The court found that the bag was not searched until it was at the police station, and the court made no findings at all concerning whether the bag was in the area within Mr. Morgan's immediate control. It did note, however, that Mr. Morgan "threw the bag to the south side of the porch" prior to his arrest. Rec., vol. I, tab 13, at 2. Findings of Fact and Conclusions of Law at 2. Our review of the record unearthed no facts that would support the Government's position on this point.

arrest invalid if remote in time or place of arrest). Indeed, it is a "necessary corollary" to the rationale underlying this warrant exception—protection of the arresting officer from injury and potential evidence from destruction—"that a valid search incident to arrest requires the search and arrest to be substantially contemporaneous." *Lavicky*, 758 F.2d at 475 (10th Cir.1985).

This requirement is necessary to fairly balance the arrestee's Fourth Amendment right to a warrant with law enforcement interests. If the police do not conduct a search of an item until several hours after an arrest, they apparently were not concerned that the arrestee would, during the course of the arrest, be able to elude or escape detention in order to obtain the item. In our case, there was no mention of any concern by the police that Mr. Morgan might have attempted to grab the gym bag, open it, and obtain a weapon or evidence. To the contrary, when asked why he didn't search the bag at the scene of the arrest, Officer Eubanks replied that he "just didn't", and that he wanted to make sure his superiors gave him an okay before he did. As to this exception, therefore, the Government has failed to meet its burden of "com[ing] forward and establish[ing] the existence of any exceptional circumstances dictating the necessity of the search without a warrant." *United States v. Anthon*, 648 F.2d 669, 675 (10th Cir.1981).

## III.

### INVENTORY SEARCH

The district court also held that the search of the bag was a constitutionally valid inventory search. An inventory search is part of a routine administrative procedure carried out at the police station incident to incarcerating a suspect. *Illinois v. Lafayette*, 462 U.S. 640, 643, 103 S.Ct. 2605, 2608, 77 L.Ed.2d 65 (1983). "Under the Fourth Amendment, the propriety of inventory searches is judged by the standard of reasonableness." *United States v. Woolbright*, 831 F.2d 1390, 1394 (8th Cir.1987) (citing *Colorado v. Bertine*, 479 U.S. 367, 107 S.Ct. 738, 93 L.Ed.2d 739 (1987)). The Government bears the burden

to show that a warrantless search justified as an inventory search fits within the parameters of the inventory exception as it has been fashioned by the Supreme Court.

The Government first must establish that the inventory was conducted pursuant to "reasonable" inventory procedures. *See Florida v. Wells*, —— U.S. ——, 110 S.Ct. 1632, 1635, 109 L.Ed.2d 1 (1990). In *Wells*, the Court upheld the suppression of evidence obtained from a search characterized by the police as an inventory search because the government failed to prove the existence of a police department policy governing the type of search involved. *Id.* at 1634–35; *see Bertine*, 479 U.S. at 374 n. 6, 107 S.Ct. at 742 n. 6 ("Our decisions have always adhered to the requirement that inventories be conducted according to standardized criteria.") (citing *Lafayette*, 462 U.S. at 648, 103 S.Ct. at 2610–11, and *South Dakota v. Opperman*, 428 U.S. 364, 374–75, 96 S.Ct. 3092, 3099–100, 49 L.Ed.2d 1000 (1976)); *United States v. Hahn*, 922 F.2d 243, 246–47 (5th Cir.1991) (search unconstitutional where police had no standardized procedure to govern the search); *United States v. Davis*, 882 F.2d 1334, 1339 (8th Cir.1989) ("An inventory search is not constitutionally reasonable, however, merely because it serves important governmental interests. To pass constitutional muster, the search also must be conducted pursuant to standard police procedures."). The Court noted that "standardized criteria", or "established routine" must regulate the inventory search because "an inventory search must not be a ruse for a general rummaging in order to discover incriminating evidence." *Wells*, 110 S.Ct. at 1635.

Contrary to the majority's gratuitous finding that the search of Mr. Morgan's bag was conducted pursuant to "standardized criteria", majority opinion at 1571, the Government conceded in its brief that "[n]o direct evidence revealed that the bag was searched pursuant to standardized procedures." Brief of Appellee at 25. My view of the record accords with the Government's concession that it has not established its burden under *Wells*. *Cf. United*

*States v. Kornegay,* 885 F.2d 713, 717 (10th Cir.1989) (inventory search upheld where "[t]estimony at the suppression hearing showed that an initial routine inventory was conducted pursuant to standard procedures by a specialist in attendance for that purpose"). I would reverse the district court's inventory conclusion on that ground alone.

Moreover, even if the police have a relevant inventory policy, the Government must still prove that the search was "designed to produce an inventory" rather than "incriminating evidence." *See Wells,* 110 S.Ct. at 1635. The particular warrantless search will be "unreasonable" if it was motivated by "bad faith or for the sole purpose of investigation." *See Bertine,* 479 U.S. at 372, 107 S.Ct. at 741. When the inventory search is employed as a pretext for discovering evidence of crime, it is unreasonable under settled Fourth Amendment caselaw. *See Wells,* 110 S.Ct. at 1635; *Bertine,* 479 U.S. at 372, 107 S.Ct. at 741; *Opperman,* 428 U.S. at 376, 96 S.Ct. at 3100. As Justice Powell stated in *Opperman,* 428 U.S. at 383, 96 S.Ct. at 3104 (Powell, J., concurring);

> "Inventory searches ... are not conducted in order to discover evidence of crime. The officer does not make a discretionary determination to search based on a judgment that certain conditions are present."

Circumstances giving rise to valid inventories generally involve two factual patterns: 1) the item was inventoried as part of the police's caretaking function, i.e., the item (usually a vehicle) is taken to the police station when it otherwise would be left unattended in a public place; or 2) the item was carried into the police station by the arrestee. The Government argues on appeal only that under *Lafayette* the bag could be inventoried because it was "an item within Morgan's possession at the time of his arrest." Brief of Appellee at 25. In *Lafayette,* the arrestee carried the inventoried article, a shoulder bag, into the police station after his arrest. The Court upheld the search, concluding that "a station house search of every item *carried on or by a person* who has lawfully been

taken into custody by the police" serves the governmental interest in protecting the arrestee's property and the safety of both the arrestee and the police. *Id.,* 462 U.S. at 648, 103 S.Ct. at 2610 (emphasis added); *see United States v. Lipscomb,* 435 F.2d 795, 800 (5th Cir.1970), *cert. denied,* 401 U.S. 980, 91 S.Ct. 1213, 28 L.Ed.2d 331 (1971). It is also clear that the police may bring in the personal effects of the arrestee at the arrestee's request. *See Lipscomb,* 435 F.2d at 799.

Here, the evidence shows that Mr. Morgan did not carry the bag to the police station himself but, rather, that it was taken to the station by the police. Officer Eubanks testified that Mr. Morgan did not say anything to him about the bag, and thus Mr. Morgan obviously did not request Officer Eubanks to bring it to the station for him. Most significantly, there is direct evidence that Officer Eubanks intended to search the bag for incriminating evidence rather than as a routine procedure incident to Mr. Morgan's pretrial incarceration. He testified at the suppression hearing that, when he saw Mr. Morgan carrying the bag, "[i]n [his] mind it was connected with the bank robbery" and he thought it might contain the clothes worn during the robbery. Rec., vol. II, at 25.

Officer Eubanks did not suggest at the evidentiary hearing that the reason he wanted to search the bag was for inventory purposes. When asked why he did not conduct the search at the scene of the arrest, he replied:

> "I just didn't. I waited till we got downtown and waited till the FBI, and [robbery sergeant] Don Bell wanted to search it, got through with everything they wanted to do, and went through it.
>
> "Q. No particular reason then?
>
> "A. I just wanted to make sure that they gave the okay to do that."

Rec., vol. II, at 25. In order to inventory the bag under routine police procedure, it seems to me unlikely that Officer Eubanks would have needed to obtain an "okay" from anyone.

Nor can I conclude that the inventory can be upheld under the "community caretaking" rationale. The police's community caretaking function is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973). *See United States v. Rodriguez–Morales*, 929 F.2d 780, 785 (1st Cir.1991). In the usual case, the circumstances surrounding the seizure will be the only guide as to whether the search was pursuant to the police caretaking function rather than its investigatory one. *See Opperman*, 428 U.S. at 375, 96 S.Ct. at 3100; *Rodriguez–Morales*, 929 F.2d at 785–86.

"A police inventory of some possession of the arrestee, such as a suitcase, presupposes that the police had some valid reason for taking custody of that object, for it is only because of such taking of custody that the police can be said to have some obligation to safeguard the contents. This presents no problem when a person is arrested in some public place while carrying a suitcase or like object, for it would be clearly improper for the police to simply leave the container unattended at the scene of the arrest. As noted by Justice Blackmun in *United States v. Chadwick:*

" 'A person arrested in a public place is likely to have various kinds of property with him: items inside his clothing, a briefcase or suitcase, packages, or a vehicle. In such instances, the police cannot very well leave the property on the sidewalk or street...... I think it is surely reasonable for the police to take the items along to the station with the arrested person.'

"Likewise, if a person is arrested in a public place and it is known that he will thereby be prevented from retrieving a suitcase belonging to him which is in the vicinity, perhaps checked aboard a soon-to-depart aircraft, it is again appropriate for the police to take custody of it.

"If a person is arrested within private premises, then it is necessary to consider the circumstances of his presence there."

2 LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 5.5(b), at pp. 536–37 (2d ed. 1987) (footnotes omitted).

In this case, if the bag had not been taken in by the police it would not have been left exposed in a public place. Rather, it would have remained in the backyard by the backporch of Mr. Morgan's friend. It would have been easy for Mr. Morgan to ask anyone living in the residence to retrieve the bag and take it inside the house for safekeeping. Moreover, as noted earlier, the record reveals direct evidence of Officer Eubanks' investigative intent. Thus, the inventory is unreasonable under the "caretaking" argument. I therefore conclude that the search was a " 'subterfuge for [a] criminal investigation[ ],' " *Bertine*, 479 U.S. at 371, 107 S.Ct. at 741 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 370 n. 5, 96 S.Ct. 3092, 3097 n. 5, 49 L.Ed.2d 1000 (1976)), rather than an "inventory" incident to Mr. Morgan's booking and post-arrest detention. While I acknowledge the necessity of routine, administrative inventory searches prior to incarceration, the police cannot be allowed to employ them as subterfuges for investigative searches—searches that, absent any exception, require a warrant. *Cf. United States v. Grill*, 484 F.2d 990, 991–92 (5th Cir.1973), *cert. denied*, 416 U.S. 989, 94 S.Ct. 2396, 40 L.Ed.2d 767 (1974).

Because the judicially-created exceptions to the warrant requirement have begun to swallow it, I find it particularly egregious that the majority feels compelled to uphold the warrantless search based on an exception that was not asserted by the Government at the hearing below nor relied on by the district court. I fear this reflects the ever-growing judicial hostility to the Fourth Amendment. While it intuitively may seem "reasonable" for the police to be allowed to search without a warrant items that could have been searched had the arrestee not tried to evade capture, we are required to test for reasonableness against the backdrop of Fourth Amendment jurisprudence.

" 'To say that the search must be reasonable is to require some criterion of

reason. It is no guide at all either for a jury or for district judges or the police to say that an "unreasonable search" is forbidden—that the search must be reasonable. What is the test of reason which makes a search reasonable? The test is the reason underlying and expressed by the Fourth Amendment: the history and experience which it embodies and the safeguards afforded by it against the evils to which it was a response.'"
*Chimel*, 395 U.S. at 765, 89 S.Ct. at 2041 (quoting *United States v. Rabinowitz*, 339 U.S. 56, 83, 70 S.Ct. 430, 433, 94 L.Ed. 653 (Frankfurter, J., dissenting)).

Because the majority imposes its notion of reasonableness to validate a search conducted in violation of the Fourth Amendment, I respectfully dissent.